## Richmond

### Gail Yeatts Murphy v. Virginia Carolina Freight Lines, Incorporated.

April 28, 1975.

Record No. 740559.

Present, All the Justices.

*Charles E. Carter*, for plaintiff in error.

*Frank O. Meade (Meade, Tate, Meade & Daniel*, on brief), for defendant in error.

Harman, J., delivered the opinion of the court.

Gail Yeatts Murphy (plaintiff) was injured in an automobile crash on January 12, 1972, on U.S. Route 58 in Pittsylvania County approximately five miles east of Danville. The case was first tried before a jury in the trial court on all issues. That jury returned a verdict against Virginia Carolina Freight Lines, Incorporated (defendant), in favor of the plaintiff for $25,000.[1]

---

[1] The jury's verdict, which found in favor of two codefendants, resulted in those defendants being dismissed from the proceedings at that stage. No error was assigned to this action of the trial court and those defendants are not parties to this appeal.

The trial court set aside the verdict on the ground that it was excessive. At a second trial on January 29, 1974, where the sole issue was the amount of damages, the jury returned a verdict for $10,000. The trial court entered judgment upon that verdict.

We granted the plaintiff a writ of error to test the trial court's action in setting aside the verdict awarded at the first trial. The defendant, conceding its liability for the plaintiff's injury, assigns cross-error to the court's ruling at the first trial denying defendant's motion for a mistrial.

To review the trial court's action in setting aside the first verdict, we must review the relevant evidence adduced there, and an incident which occurred at that trial.

Plaintiff, the mother of three young children, was a 26-year-old married woman. She was injured when the car she was driving was struck from the rear. After the crash, plaintiff went to the emergency room of Memorial Hospital in Danville where she was examined by Dr. R. E. Musgrave, an orthopedic surgeon. When X-rays failed to disclose any bony injury, Dr. Musgrave diagnosed that plaintiff was suffering from "a sprain of the muscles and ligaments involving the neck and upper back." She was fitted "with a collar which supported the neck," was given medication for pain and discomfort, and was released. Five days later, on January 17, Dr. Musgrave saw the plaintiff who was "having more pain in her neck and upper back." He arranged for her to be admitted to the hospital on January 18.

Upon her admission to the hospital, plaintiff received "medications for her pain, heat and some muscle relaxant." Her treatment included "physical therapy" several times daily to the areas involved. Plaintiff improved sufficiently to be discharged from the hospital on February 1.

Plaintiff was next seen by Dr. Gross, an associate of Dr. Musgrave, on February 11. At that time she was suffering from "a flareup of pain, a recurrence of it, and also had some [pain] in the lower back." Dr. Musgrave related her low back pain to the January 12 injury. On this visit the plaintiff was fitted with a corset for the lower back. On February 18, after the plaintiff had contacted him by telephone, Dr. Gross ordered a refill of her prescriptions for pain and muscle relaxants.

On February 28 Dr. Musgrave found that plaintiff "was making very slow progress, she wasn't much better." At that

time the affected areas were injected with an "adrenal cortical extract," which is given to "improve the soreness in muscles, ligaments and joints, used some in arthritis."

When next seen by Dr. Musgrave on March 21, plaintiff was found to be making "slow improvement." The physician found "some soreness in the muscles of the neck and upper back mostly and some limitation of motion in the spine on movement."

Dr. Musgrave next saw her on April 24 and found her "improved as far as the neck and upper back was concerned." On May 25, Dr. Musgrave felt that she had sufficiently recovered to resume her normal activities although "she was having some symptoms in those areas [neck and back]."

The plaintiff was last examined by Dr. Musgrave on August 22, 1972. He testified that he "did not feel that she had any permanent disability" as he then found her to be completely asymptomatic. When asked if she had completely recovered, he responded that "[s]he had no symptoms relative to her injured area."

Plaintiff testified about her discomfort and the treatment she received following her injury. Upon her discharge from the hospital on February 1, the plaintiff and her family went to the home of plaintiff's mother where plaintiff remained "on bed rest" until March 16, when she moved, with her family, to a nearby trailer rented by her husband. There, she "got along pretty well — [but] still couldn't do any heavy housework."

Plaintiff wore the collar from the day of the accident until she entered the hospital on January 18. She wore a low back corset from February 11 until April 1. On the date of the first trial, July 24, 1973, Mrs. Murphy testified that she was still taking the pain killing and analgesic drugs prescribed by Dr. Musgrave. She testified that her back continued to hurt if she did "strenuous housework." She told the jury that she had never had difficulty with her lower back prior to her injury in January, 1972.

Cross-examination of Mrs. Murphy disclosed that she had received an injury to her neck and ear in another automobile crash in June, 1971. She testified, however, that she had recovered from those injuries prior to the second crash in January, 1972.

The evidence shows that the plaintiff's out-of-pocket expenses

in connection with her injuries amounted to $1,249.35, of which $1,009.35 represented the cost of medication, hospitalization and professional fees and $240.00 was spent for care of her three children while she was hospitalized and "on bed rest."

After the luncheon recess at the first trial, the court, after conferring with counsel, called the plaintiff's husband, Jerry Wayne Murphy, into chambers. The judge, who thought he had observed Mr. Murphy in a conversation with a particular member of the jury during the recess, questioned him. While he denied that he had conversed with that member of the jury, Murphy's evidence showed that Larry Yeatts, father of the plaintiff, did speak to one of the other jurors during the recess. Mr. Yeatts was then called by the court and testified that he spoke to Mr. Emerson, another member of the jury. When examined by plaintiff's counsel about this conversation, Yeatts related that he "[n]o more than spoke . . . and said, 'How are you' — this is all that was said . . . ." The court, after stating that he "could have been wrong" in thinking that there had been conversation, overruled defendant's motion for a mistrial.

Here, the plaintiff argues that the damages awarded at the first trial were clearly fair and reasonable and that this verdict should be fully reinstated.

The defendant says that the trial court was clearly right in setting aside, as excessive, the damages awarded at the first trial. To sustain this position, defendant's counsel argues that the plaintiff, seven months after the accident, "was asymptomatic with no limitation of motion, no disability and no complaint," and that she had "no fractures, no head injury, no permanency of injury and no scarring."

While the trial court, in its letter opinion, did not refer to or appear to consider the contact between the juror and a member of the plaintiff's family, defendant's counsel points to this, as an additional reason, why we should sustain the trial court's action in setting aside the first damage award.

The well established principles of law applicable here are set forth in *Edmiston* v. *Kupsenel*, 205 Va. 198, 202, 203, 135 S.E.2d 777, 780 (1964), where we said:

"In Virginia, the courts are clothed with the authority, and charged with the duty, to correct what plainly appears to be an unfair verdict in a personal injury case. The use of this

authority is but the exercise of the inherent discretion of the trial courts, limited by the admonitory principle that it is the jury's function, ordinarily, to assess damages. *Dinwiddie* v. *Hamilton*, 201 Va. 348, 352, 353, 111 S.E.2d 275; *Rawle* v. *McIlhenny*, 163 Va. 735, 744, 745, 177 S.E. 214; *E. I. DuPont Co.* v. *Taylor*, 124 Va. 750, 762-765, 98 S.E. 866; *Farish & Co.* v. *Reigle*, 11 Gratt. (52 Va.) 697, 722.

"Where the attack upon such a verdict is based upon its alleged excessiveness, if the amount awarded is so great as to shock the conscience of the court and to create the impression that the jury has been motivated by passion, corruption or prejudice, or has misconceived or misconstrued the facts or the law, or if the award is so out of proportion to the injuries suffered as to suggest that it is not the product of a fair and impartial decision, the court is empowered, and in fact obligated, to step in and correct the injustice. *Lilley* v. *Simmons*, 200 Va. 791, 797, 108 S.E.2d 245; *C. D. Kenny Company* v. *Solomon*, 158 Va. 25, 30, 31, 163 S.E. 97; *American Oil Co.* v. *Nicholas*, 156 Va. 1, 12-14, 157 S.E. 754; *Ches. & O. Ry. Co.* v. *Arrington*, 126 Va. 194, 217, 101 S.E. 415.

"If the verdict is determined to be excessive, the court may put the successful party on terms to accept a reduced amount, deemed reasonable compensation for his injuries, as an alternative to awarding a new trial (Code, § 8-350), or it may order a new trial as to the whole amount of damages (Code, § 8-224).

"But neither course of action is warranted if the verdict merely appears to be large and more than the trial judge would have awarded had he been a member of the jury. If the verdict is supported by sufficient evidence and is reached in a fair and impartial trial, it cannot be disturbed. *Danville Com. Hospital* v. *Thompson*, 186 Va. 746, 763, 764, 43 S.E.2d 882; *Simmons* v. *Boyd*, 199 Va. 806, 811, 814, 102 S.E.2d 292; Burks Pleading and Practice, 4th Ed. Sec. 321, pp. 582-585." [Footnote omitted.]

When these principles are applied to the evidence adduced at the first trial, we find that the trial court erred in setting aside the damages awarded by the jury's verdict. The plaintiff suffered painful injuries which hospitalized her for two weeks and confined her to bed for more than two months following her

injury. She was required to wear a collar to support her neck for one week and a low back support for almost two months. While her pain and discomfort diminished with the passage of time, it was not until May 25, more than four months after her injury, that she was sufficiently recovered from her injuries to resume her normal activities. Even then she was still "having some symptoms" according to Dr. Musgrave.

When she was last seen by her physician on August 22, 1972, at the time of her discharge from his care, Dr. Musgrave found plaintiff to be completely asymptomatic and he was of the opinion that the plaintiff had no permanent disability. When asked, at trial, if plaintiff had completely recovered on August 22, his guarded reply was that plaintiff "had no symptoms relative to her injured area" when he last saw her.

Plaintiff's testimony, which was uncontradicted, was that she had never had difficulty with her lower back prior to the January 12 accident. At the first trial, more than 18 months after her injury, plaintiff testified, and the jury obviously believed, that she continued to suffer pain and discomfort when she performed "strenuous housework," a normal and necessary activity for a housewife and mother of three small children. Plaintiff's total out-of-pocket expenses were $1,249.35.

■ In personal injury cases, where the action merely sounds in damages, and where there is no rule for measuring such damages, the amount to be awarded is left largely to the discretion of the jury. The verdict of the jury, arrived at upon competent evidence and controlled by proper instructions, has always been held to be inviolate against disturbance by the courts. *See Smithey* v. *Sinclair Refining Co.,* 203 Va. 142, 145, 122 S.E.2d 872, 875 (1961). This is particularly true where the evidence establishes that the injured party has suffered pain for a prolonged period of time as there has not yet been discovered any standard by which to measure, in dollars and cents, the value of physical pain and suffering. *See Dinwiddie* v. *Hamilton,* 201 Va. 348, 352, 111 S.E.2d 275, 278 (1959).

■ We will now deal with the defendant's assignment of cross-error. The judge satisfied himself from his examination of plaintiff's husband and father that no improper and prejudicial communication occurred during the luncheon recess at the first trial. Counsel either examined these witnesses or had the opportunity to do so.

While we strongly disapprove of communication between litigants or witnesses and prospective or active jurors, whether occurring before or during trial, the trial judge apparently satisfied himself that the conversation was conceived in innocence and was casual and unconnected with the case. In these circumstances we hold that the trial court did not abuse its discretion in refusing to grant a mistrial. *Seaboard Coast Line R. R. v. Ward,* 214 Va. 543, 546, 202 S.E.2d 877, 880 (1974).

For the reasons set forth above, all proceedings subsequent to the first jury's verdict are annulled and set aside and final judgment will be entered here for the plaintiff on that verdict.

*Affirmed in part, reversed in part and final judgment.*